# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH JABIR POPE,<br>Plaintiff,<br><br>v.<br><br>CITY OF BOSTON; and Former Boston Police Detectives and/or Officers, PETER J. O'MALLEY, JAMES T. CURRAN & ROBERT FLYNN, *in their individual capacities*, as well as-yet-unknown Boston Police Officers and/or Supervisors JOHN and JANE DOES 1 THROUGH 20, Defendants. | Civil Action No. 1:24-CV-10980 |

## COMPLAINT AND JURY DEMAND

Plaintiff Joseph Jabir Pope, by and through his attorneys, Goodwin Procter, LLP and The Law Offices of Jeffrey G. Harris, allege as follows:

### INTRODUCTION

1.      For many years, including 1984, the City of Boston, the Boston Police Department ("BPD"), and certain police officers deprived citizens of their constitutional rights by, among other things, fabricating, withholding, and destroying evidence, inducing false testimony, suppressing statements that were legally required to be provided to the defense, deliberately failing to investigate the actual perpetrators, assisting potential exculpatory witnesses in being unavailable to testify, and engaging in improperly suggestive identification procedures.

2.      The deprivation of constitutional rights was part of a policy, pattern, and practice that developed due to a lack of training, supervision and discipline and by deliberate misconduct by certain officers.

1

3.      One victim of the BPD's constitutional violations is Joseph Jabir Pope ("Mr. Pope"), who was incarcerated for nearly 38 years for a crime he did not commit—the May 23, 1984 fatal shooting of Efrain DeJesus ("ED").  The shooting occurred on the first floor of a house located at 15 Nonquit Street in Dorchester.  At the time of the shooting, Mr. Pope was upstairs in the house with ED's brother, Benny DeJesus ("BD").[1]

4.      Mr. Pope has always maintained that he is innocent of the shooting.  No physical or forensic evidence ever connected him to the shooting.  No witness at trial placed Mr. Pope on the first floor, where the shooting occurred.

5.      Mr. Pope was convicted under the legal theory of "felony murder."  Under that theory, the Commonwealth claimed that even though Mr. Pope did not commit the killing, he was an accomplice in an armed robbery and thus guilty of someone else's murder.  Felony murder—where one can be guilty of murder even when they are not the killer—has now been rejected as an independent theory of liability by the Supreme Judicial Court of Massachusetts ("SJC").  *See Commonwealth v. Brown*, 477 Mass. 805, 807 (2017).  Even with this now rejected legal theory, the only evidence connecting Mr. Pope to the (former) crime was the word of the victim's brother, BD, who, despite not seeing the murder, alleged that Mr. Pope was somehow working with the shooter in connection with the murder.  In an apparent attempt to tie Mr. Pope to the shooting that occurred downstairs, the BPD coerced and induced BD into fabricating evidence that Mr. Pope was a participant in a plan to rob both brothers.  Faced with the potential of criminal charges for his own drug dealing that was known to the BPD, BD fabricated evidence that Mr. Pope robbed BD on the second floor of the house at gun point, taking money and

---

[1]  Because the victim and his brother share the same last name, they are referred to herein as "ED" and "BD" respectively.

cocaine from him in a "drug room." The BPD, including the Defendants here, supported and assisted in this fabrication.

6. No such armed robbery ever occurred. Mr. Pope was in no way connected to the murder that occurred on the first floor of 15 Nonquit Street on May 23, 1984.

7. Despite what the SJC described as a "weak" case for the Commonwealth,[2] Mr. Pope was convicted of murder in the first degree, on the felony murder theory, and armed robbery. The jury, however, was unaware of key facts, the suppression of which prejudiced Mr. Pope's defense including, among other things:

    a.  that there was cocaine found in the house after the alleged robbery;

    b.  that BD had given multiple (and inconsistent) versions of his story, including an undisclosed statement that he made on the night of the murder where he did not mention an armed robbery by Mr. Pope in a "drug room" on the second floor;

    c.  that BD had given police multiple accounts of where he went after the murder; and

    d.  that Detective Peter J. O'Malley, who interviewed BD, did not credit his story.

8. In June of 2022, the SJC found that the case "rose and fell with the believability of a witness [BD] whose testimony was riddled with inconsistencies." *Commonwealth v. Pope*, 489 Mass. 790, 801 (2022). The court ordered a new trial after determining that law enforcement illegally withheld exculpatory evidence. *See id.* at 805.

---

[2] Indeed, the initial trial resulted in a hung jury. *See Commonwealth v. Pope*, 489 Mass. 790, 793 (2022).

9.      On October 24, 2022, Suffolk County Superior Court vacated Mr. Pope's convictions.  On the same day, the Suffolk County District Attorney's Office *nolle prossed* the case after conducting a "thorough and comprehensive review."

10.     Documents discovered after the conviction show not only that evidence was unlawfully withheld from the defense, but that there was improper behavior on the part of the BPD toward witnesses.  Specifically, there is a strong indication that BD was induced to change his statement to police in order to implicate Mr. Pope and avoid criminal charges.  Indeed, at trial, BPD detectives lied about the existence of cocaine and BD, the only percipient witness against Mr. Pope, changed his statement.  No criminal charges were ever brought against BD.

11.     This misconduct on the part of Detectives O'Malley and James T. Curran, and Officer Robert Flynn (together, the "Individual Defendants"), was part of a practice, policy, and custom of fabricating evidence where needed and suppressing exculpatory evidence, including evidence of that fabrication.

12.     The BPD, including John and Jane Does 1 through 20, and the City of Boston failed to train, discipline, and supervise officers who conducted investigations into homicides.

13.     The City of Boston was, or should have been, aware of the potential for misconduct and the actual misconduct of its officers, but failed to act.

14.     As a direct result of Defendants' misconduct, Mr. Pope was incarcerated for nearly 38 years and suffered injuries and damages, including but not limited to: pain and suffering, severe mental anguish, emotional distress, physical illness, inadequate medical care, humiliation, injury to reputation, permanent psychological damage, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, personal fulfillment, family relations, travel, enjoyment, and expression.  This suit

seeks to compensate Mr. Pope and hold Defendants accountable for the misconduct which led to these injuries and abuses, which exist to this day.

## JURISDICTION AND VENUE

15.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Pope's rights as secured by the United States Constitution.

16.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.  Mr. Pope invokes the pendant jurisdiction of the Court to hear and to decide claims under state law.

17.     Venue is proper in the District of Massachusetts under U.S.C. 28 U.S.C. § 1391(b), because this is the district in which the claim arose.

18.     Mr. Pope has complied with the requirements of the Massachusetts Tort Claims Act, Mass. Gen. Laws c. 258 § 1, et. seq.  Mr. Pope served the City of Boston and BPD with presentment letters dated May 3, 2023.

## PARTIES

19.     At all times relevant hereto, Mr. Pope was a resident of the City of Boston.  At the time of the arrest giving rise to this action, Mr. Pope was living in Boston, and was employed at Metropolitan Security in Boston.

20.     Defendant City of Boston is a municipal entity under the laws of the Commonwealth of Massachusetts, which employs or employed the Defendant Detectives and/or Officers, including John and Jane Does 1 through 20.

21.     Individual Defendant Peter J. O'Malley, who is sued in his individual capacity, was employed as a Detective in the BPD at the time of the events giving rise to the claims at

issue.  He acted under color of the laws of the Commonwealth of Massachusetts and the City of Boston.

22.     Individual Defendant James T. Curran, who is sued in his individual capacity, was employed as a Detective in the BPD at the time of the events giving rise to the claims at issue. He acted under color of the laws of the Commonwealth of Massachusetts and the City of Boston.

23.     Individual Defendant Robert Flynn, who is sued in his individual capacity, was employed as a police officer in the BPD at the time of the events giving rise to the claims at issue.  He acted under color of the laws of the Commonwealth of Massachusetts and the City of Boston.

24.     Defendants John and Jane Does 1 through 20, whose identities are currently unknown, represent those employees of the BPD who supervised certain Defendants and/or had personal involvement in the investigation of Mr. Pope.  John and Jane Does 1 through 20 are sued in their individual capacities, and they acted under color of the laws of the Commonwealth of Massachusetts and the City of Boston.

## FACTUAL ALLEGATIONS

25.     On July 2, 1986, Mr. Pope was convicted of murder in the first degree, on a felony murder theory, and armed robbery, for which he was sentenced to life imprisonment without the possibility of parole and eight to ten years, respectively.

26.     Mr. Pope was 34 years old in 1986 and innocent of the charges.

27.     Mr. Pope's conviction rested solely on the fabricated testimony of the Commonwealth's chief witness, BD, the victim's brother.

28.     In May 1984, Mr. Pope was working as a security guard at the welfare office in Boston.  While working at the welfare office, Mr. Pope met BD, who worked in the same building.

29.     On May 23, 1984, Mr. Pope and his co-worker Floyd Hamilton arrived at BD's residence located at 15 Nonquit Street in Dorchester, Massachusetts to purchase a small amount of cocaine from BD and to discuss a role Hamilton might play in BD's operation.  They did not go there to rob or murder anyone and had no weapons.

30.     Mr. Pope, Hamilton, and BD met in a small room on the second floor of the house at 15 Nonquit Street, where there was cocaine and other drug paraphernalia present.  After some time, BD wanted to speak to Mr. Pope privately and asked his brother, ED, to escort Hamilton downstairs.  Hamilton and ED then went downstairs.  Neither Mr. Pope nor Hamilton had met ED prior to this day.

31.     Moments later, Mr. Pope and BD heard a shotgun blast from downstairs. Hamilton saw a third party, Ricardo Tisdale, shoot ED on the first floor.  Mr. Pope and BD ran to the top of the stairs and saw ED was shot dead.

32.     Upstairs after the shooting, BD pleaded with Mr. Pope to help him remove the drugs and paraphernalia from the house.

33.     Mr. Pope refused and left before the police arrived.

34.     Officer William Baker and his partner Officer Robert Flynn of the BPD responded and interviewed BD at the scene.  Officer Flynn drafted a short report based on this interview.

35.     Later the same night, BD was brought to the police station for further questioning by Detectives Peter J. O'Malley and James T. Curran.

36.     Assistant District Attorney Robert L. Goodale documented BD's statements at the police station in a Preliminary Field Report and later in a Memorandum dated May 29, 1984 (the "Goodale Memo").

37.     The Goodale Memo recounted, among other things, that BD initially claimed that Mr. Pope was downstairs at the time of the murder; that Detective O'Malley did not believe BD's story; that Detective O'Malley believed BD was a drug dealer; and that packets of cocaine were found at the scene of the crime, on the second floor of BD's house.

38.     BD's statements to police on the night of the murder vary from his accounts later in the case, including at the probable cause hearing and at the trials.

39.     Over the course of the prosecution, BD's statements evolved to support the Commonwealth's theory of felony murder.

40.     As BD was changing his story to comport with the detectives' and officers' theory of the case, the BPD failed to investigate BD for any drug crimes or investigate other actual perpetrators.

41.     Pope was arrested on May 25, 1984.

### Mr. Pope's Innocence

42.     Other than BD's fabricated story, there was no evidence that Mr. Pope participated in a murder or armed robbery of the DeJesus brothers.

43.     Members of the BPD knew or should have known from the start of the investigation that Mr. Pope was innocent of the murder of ED.  The reasons include, in part:

   a.   Hamilton, Mr. Pope's co-defendant, told police he witnessed Tisdale (accompanied by another man) commit the murder with a shotgun;

   b.   The shotgun that killed ED was found in the possession of Tisdale when he was arrested with the gun several blocks away, one week after the crime;

c.  Mr. Pope was wearing "shorts and a T-shirt" that night and could not have
brought a concealed gun into the house while wearing such clothing;

d.  Mr. Pope was not on the first floor at the time of the shooting;

e.  Mr. Pope made no statement or in any way directed the murder that happened
downstairs from him;

f.  As set forth in the Goodale Memo, Detective O'Malley did not believe BD's story
and instead believed that BD was a drug dealer.  Detective O'Malley also knew
that cocaine had been found in BD's house after the alleged robbery, suggesting
that no robbery of cocaine had actually occurred.

### The agreement to fabricate testimony.

44.     BD's account of the night of May 23, 1984 changed during the investigation of
the case, evolving from one story the night of the murder (where he did not allege any armed
robbery by Mr. Pope upstairs) to another story at the probable cause hearing and at the trial
(where he did allege that Mr. Pope robbed him upstairs).

45.     In return, the Individual Defendants protected BD.  Although Detective O'Malley
knew that BD was dealing drugs from his house (and he had no evidence ED was a dealer as BD
claimed), he let BD mischaracterize ED as the drug dealer.  And when BD later fabricated
evidence about Mr. Pope, the BPD, including John and Jane Does 1 through 20, declined to
investigate or prosecute him, and caused the drug evidence to disappear.

46.     The Goodale Memo memorialized that Officer Flynn had found 10 packets of
what he believed to be cocaine at the house on the night of the murder, but over the course of the
proceedings, the police produced no drugs and claimed that no drugs were found.  Specifically,

a.  On July 19, 1984, Officer Flynn lied to the Court at a probable cause hearing about not having found drugs in the house.

b.  On August 14, 1984, Detective Curran lied to the grand jury about having found something at the scene of the crime (but not cocaine) and about being at the scene of the crime to interview BD.

c.  At the first trial in October 1985, Officer Flynn lied to the jury about not having found anything upstairs at the scene of the crime and further lied to the jury about being given "empty packets" found at the scene of the crime.

d.  At the second trial in June 1986, Detective Curran lied about having spoken to BD at the scene of the crime and by failing to disclose that BD had fabricated evidence of an armed robbery.

e.  At the second trial in June 1986, Detective O'Malley lied to the jury by failing to disclose that BD had fabricated evidence of an armed robbery.

f.  In May 1987, Detective Curran lied to the jury about Officers Baker or Robinson giving him "empty packets" from the crime scene.

47.    The BPD's lie that BD was not a drug dealer involved further lies to cover up that falsehood.  For instance, BD had to explain why he left the scene of the crime without calling the police, so he said he took his kids to his girlfriend's house after the shooting, but he provided fake names for her and would not give her address.  This claim is completely uncorroborated and the BPD did not make adequate efforts to investigate it.

48.    BD also gave varying accounts about what he did after the shooting: one time saying that he tried to move the body, another time that he ran across the street to a friend's

house, and another time saying that he drove a few blocks to a different friend's house—all before calling the police.

49.     Knowing they were false, the police never conducted any investigation to determine the truth of BD's statements.

***The conduct of the BPD in Mr. Pope's case was consistent with a policy and practice of fabricating evidence and then suppressing exculpatory evidence of that fabrication.***

50.     The District Attorney hiding evidence—as reflected in the undisclosed Goodale Memo—was just one part of a broader effort by law enforcement, including the BPD, to frame Mr. Pope and cover up having done so.  In addition to the above, that effort involved numerous independent acts of misconduct by the BPD that alone and together violated Mr. Pope's constitutional and state law rights.  Some of them are summarized below.

51.     As described above, the BPD and particularly Detective O'Malley encouraged and assisted BD in telling his false story, knowing it to be false.

52.     Drug evidence that was at the location of the murder when officers first arrived was later removed or destroyed.  The officers then lied in court about the existence of drugs.

53.     Although the Commonwealth accused Mr. Pope of stealing a small amount of money from BD, *no other cash was ever found in the house*—a house that all parties agreed drugs were sold out of.

54.     In order to further the cover-up, the BPD destroyed or otherwise failed to maintain the file for this murder investigation.  For instance, the 911 recording of BD was destroyed and/or not produced.  And the BPD's notes of BD's interview on the night of the murder were destroyed or otherwise not produced to the defense.  The police made no notes or recordings of any interactions with BD, their central witness.

55.     Detective Curran's presentation to the grand jury was false in at least two ways: first, he mischaracterized his own role in the investigation by claiming he spoke with BD at the scene (the Goodale Memo demonstrates otherwise).  Second, he failed to apprise the grand jury of critical and significant inconsistencies in BD's story (e.g., that BD made no mention of robbery in the "drug room" in his interview the night of the murder).

56.     A court found that in September of 1984, the BPD violated co-defendant Hamilton's *Miranda* rights by ignoring his request for counsel.

57.     The BPD, including John and Jane Does 1 through 20, engaged in an improperly suggestive identification procedure with BD by showing him a single photo of Hamilton (his license) on the night of the murder.

58.     The BPD, including John and Jane Does 1 through 20, adequately failed to investigate Tisdale or his accomplice despite being specifically told by Hamilton that Tisdale was the shooter and despite Tisdale being found in possession of the murder weapon.  This failure included not investigating Tisdale promptly and not testing the firearm Tisdale possessed until defense counsel insisted they do so, which resulted in exculpatory evidence the BPD had been attempting to hide.

### *Detective O'Malley's own pattern of misconduct.*

59.     Detective O'Malley repeatedly and willfully violated defendants' rights as part of a broader custom, policy, and practice of the BPD and the City of Boston.  Mr. Pope's case is also not the first or last time that Detective O'Malley fabricated evidence and then tried to hide evidence of that fabrication.  It was his *modus operandi* and such conduct was tolerated.  His misconduct was widely known as the cases below reflect.

60.     In *Commonwealth v. Jones*, Suffolk County Superior Court vacated Milton Jones'

convictions.  *See Commonwealth v. Jones*, 7584-CR-95364, Mem. & Order on Def.'s Mot. for a

New Trial (Ricciutti, J., Nov. 10, 2022).  In 1976, Jones was convicted of second-degree murder

and related charges stemming from an armed robbery.  *See id. at 1.*  He was sentenced to life

imprisonment with the opportunity for parole after 15 years and was granted parole on his first

opportunity in 1990.  *See id.*  No physical evidence connected Jones to the crime, and the

conviction was based on eyewitness testimony only.  *See id.*  Despite being granted parole, Jones

moved for a new trial, which the court granted in 2022, noting, among other things, that

Detective O'Malley facilitated flawed identifications.  *See id.* at 7-17.

61.     In *Commonwealth v. Gaines*, Suffolk County Superior Court vacated Raymond

Gaines' convictions.  *See Commonwealth v. Gaines,* 7584-CR-91203, Mem. of Dec. & Order on

Def.'s Mot. for New Trial (Squires-Lee, J., Nov. 30, 2022).   In 1976, Gaines was convicted of

first-degree murder, armed robbery, and related charges, and was subsequently sentenced to life

in prison without the possibility of parole.  *See id.* at 5.  In 2021, Gaines filed a motion for a new

trial based, in relevant part, on "the recantation of David Bass, one of the key Commonwealth

witnesses, in an affidavit which the Commonwealth did not provide to Gaines for more than [25]

years."  *Id.* at 1.  Mr. Bass's 1990 affidavit explained that he agreed to lie because "I wanted to

protect my own activities and my friends' activities" and "the police [(Detective O'Malley)]

agreed to keep me out of jail when I told them the same lies."  *Id.* at 10-11.  The court granted

the motion for the new trial, finding "evidence of Detective O'Malley's misconduct in other

cases [to be] exculpatory, particularly where [Bass and another witness] attested to similar police pressure to provide false testimony." *Id.* at 37.[3]

62.     Detective O'Malley himself had a history of lying.  During the time he was investigating the *Gaines* case in 1974, Detective O'Malley was suspended without pay for filing a false police report to cover up an incident where his partner, Detective Arthur Linksy, was injured by another BPD officer.  *See id.* at 32; "2 disciplined for covering up details of detective's beating," BOSTON GLOBE, (Mar. 9, 1974), https://www.newspapers.com/article/the-boston-globe-chinatown-march-9-1974/124421384/.

63.     Detective O'Malley was a lead detective in the botched investigation into the murder of Carol Stuart and her unborn child.  As the Superior Court recognized in *Gaines*, federal investigators looking into the Stuart investigation "concluded that Detective O'Malley pressured witnesses to give false information, threatened witnesses, and included false coerced information in search warrant affidavits, even though he knew the witnesses intended to recant the statements."  *Gaines*, 7584-CR-91203, Mem. of Dec. & Order on Def.'s Mot. for New Trial, at 32.

64.     Indeed, in 1990, following the Stuart investigation, the Massachusetts Attorney General issued a report accusing Detective O'Malley of threatening, intimidating, and coercing witnesses into providing false testimony.  *See* REPORT OF THE ATTORNEY GENERAL'S CIVIL RIGHTS DIVISION ON BOSTON POLICE DEPARTMENT PRACTICES (Dec. 18, 1990).  Audio and transcripts of the interviews by Detective O'Malley and others demonstrate they were not truly

---

[3]  These "other cases" include an incident in which Detective O'Malley was suspended without pay for filing a false police report in 1974 and the Carol Stuart murder investigation in 1989, set out further below.  *Gaines*, 7584-CR-91203, Mem. of Dec. & Order on Def.'s Mot. for New Trial, at 32.

interested in getting reliable information.  Detective O'Malley threatened potential witnesses with jail time, based on a lie; he credited information that even the witness did not truly believe; and he provided all of the details of the murder to the witnesses – and then claimed the details came from the witnesses.  Detective O'Malley's *modus operandi* was to threaten witnesses with criminal action until they provided the evidence he sought against the individual he was trying to convict.

65.     In *Cox v. O'Malley*, 93-cv-10632, Detective O'Malley and others were sued by Leroy Cox, a victim of an illegal search warrant that was executed in connection with the Stuart investigation.  Detective O'Malley wrote in a memorandum to his attorney Regina Quinlan that a witness named Eric Whitney "was afraid to come to the [homicide] unit because he believed that he had active warrant[s] on him.  [Police Officer Trent] Holland was told to inform Eric that the homicide detectives would assist him in removing the defaults."  Mem. From O'Malley to Quinlan (undated), at 2.  Detective O'Malley stated that Joey Bennett was thought to be the key witness against his uncle, Willie Bennett, the wrongful suspect in the Stuart investigation, and that police officers had executed a search warrant at Joey's home.  *See id.* at 9.  Detective O'Malley further stated that officers had found "a white powder which later was analyzed as cocaine" in Joey's bedroom and used this "cocaine" to arrest Joey.  *Id.*

66.     In *Commonwealth v. William Bennett*, another case involving search warrants in connection to the Stuart investigation, the SJC noted that "the defendant presented . . . a reasonable basis for finding at this time that certain [of O'Malley's] statements in the affidavit in support of the issuance of [a] search warrant . . . were false and that the police affiant [(O'Malley)] knew that those statements were false."  *Commonwealth v. William Bennett*, 414 Mass. 269, 273 n.3 (1993); *see also United States v. Leon*, 468 U.S. 897, 948 (1984) (discussing

15

Detective O'Malley's creation and use of a "fundamentally defective warrant" to search a suspect's home) (Brennan, J., dissenting).

67.      Relatedly, in *Veda Bennett v. O'Malley*, family members of Willie Bennett brought claims pursuant to 42 U.S.C. § 1983 against the City of Boston and individual employees of the BPD, including Detective O'Malley.  *See Veda Bennett v. O'Malley*, 93-CV-10403.  The complaint alleges that Detectives O'Malley and Holland, among others, executed a search warrant at the apartment of Yvonne Jenkins, Willie Bennett's girlfriend, during which Detective Holland claimed to have discovered a bag of marijuana, and Detective O'Malley used those drugs to threaten Jenkins with imprisonment and the loss of custody of her children in order to get her to reveal Willie's whereabouts.  First Am, Compl. 93-CV-10403, at 13-16.  No items related to the death of Carol Stuart were ever found at the apartment, and Jenkins was never charged with drug possession as a result of the search of her home.  *Id.* at 14-15.  The complaint also alleges that the "white powder" found in Joey Bennett's bedroom was eventually found to not be cocaine and the drug charges were dismissed against him.  *Id.* at 11.

68.      The repeated violations by Detective O'Malley and his fellow officers show they were either trained to violate rights or were so poorly trained as to their obligations that the BPD knew or should have known of this pattern and did not stop it.  The failure of adequate disciplinary processes confirmed this misconduct as the BPD's and the City of Boston's policy.

**The BPD has a pattern and practice of hiding exculpatory evidence.**

69.      By 1984, it was clearly established that police could not withhold exculpatory evidence, that is "evidence favorable to an accused," from the prosecution and defense where "the evidence is material either to guilt or to punishment."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see, e.g.*, *Charles v. City of Bos.*, 365 F. Supp. 2d 82, 88 (D. Mass. 2005) ("[T]here was

no question that criminal investigators had a *Brady* obligation to disclose material exculpatory evidence to the prosecutor, who in turn was obliged to disclose it to the defense"), citing *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) ("[W]as it clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about fingerprints and the conduct of a lineup? . . . The answer is yes[.]").

70.     Throughout the 1970s and 1980s, officers of the City of Boston regularly withheld and fabricated evidence, leading to botched investigations and wrongful convictions. The First Circuit found plausible evidence that the BPD violated the rights of criminal defendants as a matter of policy during this time.  *See Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011).  In 1972, James Haley was convicted of first-degree murder and sentenced to life in prison after BPD officers failed to disclose all exculpatory and impeachment evidence.  *See id.* at 44-45, 50.  In 2009, following his exoneration, Haley brought a section 1983 claim against the City of Boston for the non-disclosure of certain inconsistent statements by the key prosecution witnesses in the case.  *Id.* at 45.  The First Circuit held that the City could be held liable where there is a policy which violates civil rights, such as a policy of non-disclosure of exculpatory evidence.  *Id.* at 51-52, citing *Monell*.  On remand, the district court found:

> [T]he testimony of [former] Commissioner DiGrazia and [former head of Training] Wasserman, if credited by a jury, would establish that *Brady* and possibly *Mooney* [*v. Holohan*, 294 U.S. 103 (1935)], violations were rampant within the [BPD] and possibly linked to the [BPD's] use of outdated policy manuals and deficient training in the constitutional obligations of police with respect to exculpatory evidence. That in turn would support a finding that constitutional violations were well settled and widespread, such that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.

*Haley v. City of Bos.*, 2013 WL 4936840, at \*6 (D. Mass. Sept. 12, 2013) (internal quotation marks and citation omitted).

71.     In addition to the numerous lawsuits detailing BPD officers' repeated and routine misconduct, in 1992, a Management Review Committee chaired by James D. St. Clair issued a damning report concerning the state of the BPD's grossly inadequate training, supervision, and discipline.  *See* Report of BPD Management Review Committee, Jan. 14, 1992, available at https://archive.org/details/reportofbostonpo00bost/mode/2up?view=theater.  The St. Clair Committee report "identifie[d] substantial problems in the leadership and management of the Department and recommend[ed] major changes."  *Id.* at i.

72.     With regard to training, the Committee found that managerial training was "dangerously inadequate" and detective training was virtually nonexistent.  *Id.* at 70.  The Committee's review of the BPD's Internal Affairs Department files "revealed a disturbing pattern of allegations of violence toward citizens by a small number of officers," and that "[t]he failure to monitor and evaluate . . . officers – particularly those with established patterns of alleged misconduct – is a major deficiency . . . [that] results in an unnecessarily dangerous situation for the citizens of the City of Boston."  *Id.* at iv.  It is precisely this failure to supervise and discipline officers that allowed the practices complained of here—i.e. the fabrication and failure to disclose evidence of that fabrication—to become a part of the BPD's standard operating procedure.

73.     These efforts were part of a systemic pattern, practice, custom, and policy of fabricating and withholding evidence and then failing to discipline officers who participated in such conduct.

## MR. POPE'S DAMAGES

74.     The unlawful, intentional, willful, deliberately indifferent, reckless, or bad-faith acts and omissions of Defendants caused Mr. Pope to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and incarcerated for nearly 38 years for a crime he did not commit.

75.     As a direct result of Defendants' intentional, bad-faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Mr. Pope sustained injuries and damages that continue to date and will continue into the future, including: pain and suffering, severe mental anguish, emotional distress, physical illness, inadequate medical care, humiliation, injury to reputation, permanent psychological damage, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, personal fulfillment, family relations, travel, enjoyment, and expression, for which he is entitled to monetary relief.

76.     All of the acts and omissions committed by Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## CLAIMS

## COUNT I

### 42 U.S.C. § 1983 *Monell* Claim
### (Against the City of Boston)

77.     Mr. Pope hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

78.     Mr. Pope's injuries were caused by the official policies of Defendant City of Boston and the BPD, by the practices and customs of Defendant City of Boston and the BPD, as well as by the actions of final policymaking officials for Defendant City of Boston and the BPD.

79.     At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Boston promulgated written and unwritten rules, regulations, policies, and procedures governing witness interviews, preparation and presentation of witness testimony, and the required disclosure of investigative materials and evidence.

80.     Defendant City of Boston was also responsible for the supervision, training, and discipline of employees of the City of Boston, including employees of the BPD.

81.     These rules, regulations, policies, and procedures were implemented by employees of Defendant City of Boston, including the Individual Defendants and John and Jane Does 1 through 20, who were responsible for conducting investigations of crimes in and around Boston, Massachusetts.

82.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Boston had notice of a widespread practice by its officers that individuals suspected of criminal activity, such as Mr. Pope, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes with which they had no connection.

83.     These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Boston directly encouraged and were thereby the moving force behind the type of misconduct at issue by failing to adequately supervise, train, and discipline their officers and employees who withheld material evidence,

fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

84.     The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the City of Boston, were allowed to exist because municipal policymakers with authority over the same exhibited, at minimum, deliberate indifference to the problem, thereby effectively ratifying it.

85.     The policies and practices described herein deprived Mr. Pope of his well-established constitutional right to be free from arrest without probable cause and to be free from an unreasonable seizure of his person under the Fourth Amendment to the United States Constitution as applied under the Fourteenth Amendment and his right to due process of law under the Fourteenth Amendment.

86.     Mr. Pope suffered damages as a direct and proximate result of actions taken by officers and employees of Defendant City of Boston and the BPD, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT II

### 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments
### (Against Peter J. O'Malley)

87.     Mr. Pope hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

88.     Individual Defendant O'Malley, acting individually and in concert with others, deprived Mr. Pope of his clearly established constitutional right, under the Fourth and Fourteenth Amendments of the United States Constitution, to a fair trial.

89.     Individual Defendant O'Malley deprived Mr. Pope of his right to a fair trial by fabricating inculpatory evidence, coercing false statements, and deliberately withholding exculpatory and impeachment evidence from prosecutors and defense, including the changing nature of BD's stories and the fact that cocaine was found inside the house where the crime occurred.

90.     Individual Defendant O'Malley maliciously prosecuted Mr. Pope, depriving him of his well-established constitutional right to be free from arrest without probable cause and to be free from an unreasonable seizure of his person under the Fourth Amendment to the United States Constitution as applied under the Fourteenth Amendment and his right to due process of law under the Fourteenth Amendment.

91.     As a direct and proximate result of the actions of Individual Defendant O'Malley, Mr. Pope was wrongly convicted and imprisoned for nearly 38 years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT III

### 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments
### (Against James T. Curran)

92.     Mr. Pope hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

93.     Individual Defendant Curran, acting individually and in concert with others, deprived Mr. Pope of his clearly established constitutional right, under the Fourth and Fourteenth Amendments of the United States Constitution, to a fair trial.

94.     Individual Defendant Curran deprived Mr. Pope of his right to a fair trial by fabricating inculpatory evidence, coercing false statements, and deliberately withholding exculpatory and impeachment evidence from prosecutors and defense, including the changing

nature of BD's stories and the fact that cocaine was found inside the house where the crime occurred.

95.     Individual Defendant Curran maliciously prosecuted Mr. Pope, depriving him of his well-established constitutional right to be free from arrest without probable cause and to be free from an unreasonable seizure of his person under the Fourth Amendment to the United States Constitution as applied under the Fourteenth Amendment and his right to due process of law under the Fourteenth Amendment.

96.     As a direct and proximate result of the actions of Individual Defendant Curran, Mr. Pope was wrongly convicted and imprisoned for nearly 38 years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT IV

### 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments
### (Against Robert Flynn)

97.     Mr. Pope hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

98.     Individual Defendant Flynn, acting individually and in concert with others, deprived Mr. Pope of his clearly established constitutional right, under the Fourth and Fourteenth Amendments of the United States Constitution, to a fair trial.

99.     Individual Defendant Flynn deprived Mr. Pope of his right to a fair trial by fabricating inculpatory evidence, coercing false statements, and deliberately withholding exculpatory and impeachment evidence from prosecutors and defense, including the changing nature of BD's stories and the fact that cocaine was found inside the house where the crime occurred.

100.     Individual Defendant Flynn maliciously prosecuted Mr. Pope, depriving him of his well-established constitutional right to be free from arrest without probable cause and to be free from an unreasonable seizure of his person under the Fourth Amendment to the United States Constitution as applied under the Fourteenth Amendment and his right to due process of law under the Fourteenth Amendment.

101.     As a direct and proximate result of the actions of Individual Defendant Flynn, Mr. Pope was wrongly convicted and imprisoned for nearly 38 years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT V

**42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments**
**(Against John and Jane Does 1 through 20)**

102.     Mr. Pope hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

103.     A supervisor may be found liable under section 1983 if the "supervisor's conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989).  Such reckless or callous indifference is evident "when it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." *Germany v. Vance*, 868 F.2d 9, 18 (1st Cir. 1989).

104.     The false arrest, malicious prosecution, wrongful conviction, and prolonged confinement of Mr. Pope was caused by John and Jane Does 1 through 20, supervisors of the BPD, acting in their individual capacities, who, with deliberate indifference to the rights of criminal suspects, failed to adequately train and/or supervise defendant officers, lieutenants, and detectives in proper investigative techniques.  In so doing, John and Jane Does 1 through 20

24

tacitly acquiesced in, condoned and/or encouraged the Individual Defendants to engage in unconstitutional misconduct.

105.    John and Jane Does 1 through 20, by deliberately and/or recklessly failing to train and supervise their subordinate officers, caused their subordinates to deprive Mr. Pope of his clearly established constitutional rights, including but not limited to his right to be free from deprivation of liberty without due process of law, his right to a fair trial, and his right to be free from unreasonable searches and seizures.

106.    Moreover, John and Jane Does 1 through 20 allowed their subordinates to act with impunity in an environment in which those subordinates were not supervised, disciplined, or trained, and which those subordinates knew that their violations of Mr. Pope's constitutional rights would be facilitated, approved, and/or condoned John and Jane Does 1 through 20.

107.    As a direct and proximate result of the inadequate supervision of John and Jane Does 1 through 20, Mr. Pope was wrongly convicted and imprisoned for almost 38 years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VI

**42 U.S.C. § 1983 – Civil Rights Conspiracy**
**(Against Peter J. O'Malley, James T. Curran, Robert Flynn, and**
**John and Jane Does 1 through 20)**

108.    Mr. Pope hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

109.    The Individual Defendants, acting within the scope of their employment and under color of the laws of the Commonwealth, agreed among themselves and other individuals, including John and Jane Does 1 through 20, to act in concert to deprive Mr. Pope of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to a fair trial and to be free from

unreasonable searches and seizures, false arrest and imprisonment, malicious prosecution, and deprivation of liberty without due process of law

110.    In furtherance of the conspiracy, the Individual Defendants and John and Jane Does 1 through 20, acting in concert, coerced and/or fabricated statements and testimony and failed to investigate actual perpetrators and other evidence corroborating Mr. Pope's innocence, and prepared misleading reports and testified falsely as part of a cover up.

111.    Mr. Pope is completely innocent of the murder of ED.

112.    The prosecution terminated in his favor when the judgment of conviction and sentence were vacated and dismissed.

113.    As a direct and proximate result of the actions of the Individual Defendants and John and Jane Does 1 through 20, Mr. Pope was wrongly convicted and imprisoned for almost 38 years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VII

### State-Law Claim – Negligent Training and Supervision
### (Against City of Boston)

114.    Mr. Pope hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

115.    The Individual Defendants and John and Jane Does 1 through 20 were employees and officers of the City of Boston, acting at all relevant times within the scope of their employment and under the color of law of the Commonwealth.  Defendant City of Boston is liable as a principal for all torts committed by its employees.

116.    Defendant City of Boston had a duty to exercise reasonable care in the hiring, retention, training, discipline, and supervision of its employees and officers.

117.    Defendant City of Boston breached that duty because it was aware or should have become aware of misconduct within the BPD and failed to take appropriate action, such as adequately supervising, training and disciplining officers.

118.    As a direct and proximate result of Defendant City of Boston's actions, Mr. Pope was wrongly convicted and imprisoned for almost 38 years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VIII

**State-Law Claim – Civil Conspiracy**
**(Against Peter J. O'Malley, James T. Curran,  Robert Flynn, and**
**John and Jane Does 1 through 20)**

119.    Mr. Pope hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

120.    The Individual Defendants agreed among themselves and other individuals, including John and Jane Does 1 through 20, to act in concert to cause Mr. Pope to be accused, convicted and incarcerated for a crime he did not commit.

121.    The Individual Defendants agreed among themselves and other individuals, including John and Jane Does 1 through 20, to protect one another from liability for depriving Mr. Pope of his rights.

122.    In furtherance of their conspiracy, the Individual Defendants and other individuals, including John and Jane Does 1 through 20, committed overt acts and were otherwise willful participants in joint activity.

123.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with reckless indifference to the rights of Mr. Pope, and in disregard of Mr. Pope's innocence.

124.    As a direct and proximate result of the actions of the Individual Defendants and John and Jane Does 1 through 20, Mr. Pope was wrongly convicted and imprisoned for almost 38 years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT IX

### State-Law Claim – Intentional Infliction of Emotional Distress
### (Against Peter J. O'Malley, James T. Curran, Robert Flynn, and
### John and Jane Does 1 through 20)

125.    Mr. Pope hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

126.    The Individual Defendants and John and Jane Does 1 through 20 acted intentionally to cause Mr. Pope to be charged and imprisoned without probable cause.

127.    The actions, omissions, and conduct of the Individual Defendants and John and Jane Does 1 through 20 as set forth above were extreme and outrageous and were intended to cause, or were in reckless disregard of the likelihood that their conduct would cause, severe emotional distress to Mr. Pope.

128.    As a direct and proximate result of the actions of the Individual Defendants and John and Jane Does 1 through 20, Mr. Pope suffered and continues to suffer emotional distress, and other grievous and continuing damages and injuries as set forth above.

## COUNT X

### State-Law Claim – Negligent Infliction of Emotional Distress
### (Against Peter J. O'Malley, James T. Curran, Robert Flynn, and
### John and Jane Does 1 through 20)

129.    Mr. Pope hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

130.    The Individual Defendants and John and Jane Does 1 through 20 owed Mr. Pope a duty to refrain from falsely accusing him of a crime he did not commit and to conduct a legal and thorough investigation of the murder of ED that would attempt to accurately identify, arrest, and prosecute the perpetrator(s).

131.    The actions, omissions, and conduct of the Individual Defendants and John and Jane Does 1 through 20 breached this duty.

132.    The misconduct of the Individual Defendants and John and Jane Does 1 through 20 was objectively unreasonable.

133.    It was reasonably foreseeable that the actions of the Individual Defendants and John and Jane Does 1 through 20 would cause any reasonable person, including Mr. Pope, emotional distress.

134.    As a direct and proximate result of the actions of the Individual Defendants and John and Jane Does 1 through 20, Mr. Pope suffered and continues to suffer emotional distress, and other grievous and continuing damages and injuries as set forth above.

## COUNT XI

### State-Law Claim – Malicious Prosecution
### (Against Peter J. O'Malley, James T. Curran, Robert Flynn, and
### John and Jane Does 1 through 20)

135.    Mr. Pope hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

136.    The Individual Defendants and John and Jane Does 1 through 20, under color of the laws of the Commonwealth, caused criminal proceedings to be instituted against Mr. Pope without probable cause and with malice as defined by the Commonwealth's tort law.

137.    The misconduct of the Individual Defendants and John and Jane Does 1 through 20 was willful and with reckless indifference to Mr. Pope's rights.  No reasonable officer would have believed such conduct was lawful.

138.    All proceedings terminated in Mr. Pope's favor when the judgment of conviction and sentence were vacated and dismissed.

139.    As a direct and proximate result of the actions of the Individual Defendants and John and Jane Does 1 through 20, Mr. Pope was wrongly convicted and imprisoned for almost 38 years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT XII

### State-Law Claim – *Respondeat Superior*
### (Against City of Boston)

140.    Mr. Pope hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

141.    While committing the misconduct alleged in the preceding paragraphs, the Individual Defendants and John and Jane Does 1 through 20 were employees and officers of the City of Boston, acting at all relevant times within the scope of their employment.

142.    Defendant City of Boston is liable as a principal for all torts committed by their officers and employees.

## PRAYERS FOR RELIEF

143.    WHEREFORE, Plaintiff Joseph Jabir Pope demands judgment jointly and severally against Defendants as follows:

a.  That the Court award compensatory damages to him and against the Defendants, jointly and severally, in an amount to be determined at trial;

b. That the Court award punitive damages to him, and against Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

c. For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

d. For any and all other relief to which he may be entitled.

## JURY DEMAND

Mr. Pope respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

Dated this 17th day of April, 2024

Respectfully submitted,

JOSEPH JABIR POPE,

By his attorneys,

*/s/ Joseph F. Savage*
Joseph F. Savage (BBO # 443030)
Zachary Weinstein (BBO # 709811)
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Tel.: (617) 570-1000
jsavage@goodwinlaw.com
zweinstein@goodwinlaw.com

Ashley Moore Drake (BBO # 694731)
Goodwin Procter LLP
1900 N Street NW
Washington, DC 20036
Tel.: (202) 346-4000
amdrake@goodwinlaw.com

Melissa Brumer
Jessica A. Vogele
Magdalin Peña Jimenez
Goodwin Procter LLP
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 813-8800
mbrumer@goodwinlaw.com
jvogele@goodwinlaw.com
mpena@goodwinlaw.com

Jeffrey G. Harris (BBO # 679118)
PO Box 219
West Newton, MA 02465
Tel.: (617) 244-1989
jh@jeffharrislaw.com