UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **JOSEPH JABIR POPE,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> **CITY OF BOSTON, et al.,** ) <br> ) <br> **Defendants.** ) <br> ) | Case No. 24-cv-10980-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                           **November 7, 2024**

**I.    Introduction**

Plaintiff Joseph Jabir Pope ("Pope"), has filed this lawsuit against Defendants the City of Boston (the "City"), and former Boston Police Detectives and Officers Peter J. O'Malley ("O'Malley"), James T. Curran ("Curran"), Robert Flynn ("Flynn") in their individual capacities, (the "Officer Defendants") and John and Jane Does Nos. 1–20 (collectively, the "Defendants") concerning the Defendants' policies, practices, training and role in Pope's conviction of the fatal shooting in 1984 that was overturned by the Suffolk County Superior Court on October 24, 2022. D. 1 at 1-4. Pope alleges a violation of his Fourth and Fourteenth Amendment right to due process under 42 U.S.C. § 1983 (Counts II-V) and claims of a civil rights conspiracy pursuant to 42 U.S.C. § 1983 and state law (Counts VI and VIII), intentional infliction of emotional distress (Count IX), negligent infliction of emotional distress (Count X), and malicious prosecution (Count XI) against the Officer Defendants and John and Jane Does No. 1-20, and a Monell claim under 42 U.S.C. § 1983 (Count I), a state law negligent training and supervision claim (Count VII) and state law

*respondeat superior* claim (Count XII) against the City. D. 1 at 19-30. The City has moved to dismiss Counts I, VII and XII against them, D. 21, but withdrew its challenge to Count XII at oral argument. D. 46 at 4-5. Accordingly, and for the reasons discussed below, the Court DENIES the City's motion to dismiss Counts I and VII.

## II.     Standard of Review

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Germanowski v. Harris, 854 F.3d 68, 71 (1st Cir. 2017) (internal quotation marks and citation omitted). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit. Id. Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (quoting Iqbal, 556 U.S. at 678).

## III.    Factual Background

The following facts are drawn from Pope's complaint, D. 1, and are accepted as true for the purpose of resolving the motion to dismiss.

Pope was convicted of first-degree felony murder and armed robbery for the May 23, 1984 fatal shooting of Efrain DeJesus ("ED") and was incarcerated for nearly thirty-eight years. D. 1 ¶¶ 3, 5. The primary evidence presented at trial connecting Pope with the murder was the testimony of the victim's brother "BD" whom Defendants allegedly "coerced and induced . . . into

2

fabricating evidence" that Pope robbed BD at gun point, taking some money and cocaine from him. Id. ¶ 5. There was also evidence that allegedly was suppressed by police that could have aided Pope's defense including, but not limited to, that BD had provided inconsistent versions of his story and O'Malley, who interviewed BD, did not credit BD's story. Id. ¶ 7. In June 2022, the Supreme Judicial Court ordered a new trial based in part on the fact that the Boston Police Department ("BPD") had withheld exculpatory evidence. Id. ¶ 8. On October 24, 2022, the Suffolk Superior Court vacated Pope's convictions and the Suffolk County District Attorney's Office *nolle prossed* the case after conducting a "thorough and comprehensive review." Id. ¶ 9.

### A. Exculpatory Evidence Issues with the Investigation and Trial

As alleged, discovery after Pope's conviction suggested that evidence was withheld from his defense and that BD was influenced by the BPD to change his statements to avoid criminal charges against him. Id. ¶ 10. Assistant District Attorney Robert Goodale documented BD's statements at the police station when he was interviewed (the "Goodale Memo"), which was purportedly not disclosed to the defense. Id. ¶¶ 36, 50. These statements by BD in the Goodale Memo were inconsistent with accounts he later made during the probable cause hearing and at trial and his statements allegedly "evolved" to support the Commonwealth's theory of felony murder. Id. ¶¶ 37-39. The Goodale Memo also included impressions from O'Malley that he was skeptical of BD's story. Id. ¶¶ 37, 43(f). O'Malley purportedly knew that cocaine had been found in BD's house after the alleged robbery, which suggested that a robbery of cocaine had not occurred. Id. ¶ 43(f). The Goodale Memo also included documentation that Flynn had recovered ten packets of purported cocaine from the house on the night of ED's murder but the police produced no drugs and allegedly claimed no drugs were found at the scene. Id. ¶ 46.

O'Malley, Curran and Flynn were involved in the investigation of ED's murder and interviewed BD. Id. ¶¶ 34-35. The complaint alleges that O'Malley, Curran and Flynn provided

3

untruthful testimony concerning whether BPD had found cocaine at the scene of the crime and that BD had fabricated evidence of an armed robbery.[1]  Id. ¶¶ 10, 46, 55.  BPD, and specifically O'Malley, assisted BD in telling a false story, including that he was not a drug dealer.  Id. ¶¶ 47, 49, 51.  Despite the inconsistencies in BD's story, BPD did not investigate other individuals, including an individual who was found in possession of the murder weapon.  Id. ¶ 43, 58.  Other evidence was also not properly maintained by BPD and was not produced, including the 911 recording of BD as well as BPD's notes of BD's interview the night of the incident.  Id. ¶ 54.

### B.     Alleged Pattern of Misconduct Within BPD for Handling Evidence

The complaint alleges that, in the 1970s and 1980s, the BPD purportedly withheld and fabricated evidence that led to other wrongful convictions.  Id. ¶ 70.  In 1992, a Management Review Committee report by James St. Clair (the "St. Clair Committee Report") detailed inadequate training, supervision and discipline within BPD.  Id. ¶¶ 71-72.  In particular, the complaint alleges that O'Malley has been involved in other criminal cases where evidence has purportedly been fabricated or there have been flawed evidentiary procedures and he has previously been suspended for failing to file a report and covering up an incident in which his partner was injured.  Id. ¶¶ 59-67.  O'Malley was also the lead investigator into the murder of Carol Stuart, (the "Stuart Investigation"), which was a botched criminal investigation because O'Malley purportedly pressured witnesses to give false information and procured search warrants based on that false information.  Id. ¶ 63.

---

[1] The Court takes judicial notice of Commonwealth v. Pope, 489 Mass. 790, 794-97 (2022), in which the SJC held, among other things, that the Goodale memo constituted exculpatory evidence that the Commonwealth should have disclosed to defense counsel.

IV.     **Procedural History**

Pope initiated this action on April 17, 2024. D. 1. The City has moved to dismiss the § 1983 Monell claim and state law negligent training and supervision and *respondeat superior* claims against it (Counts I, VII and XII), D. 21, but later withdrew the motion as to Count XII. D. 46 at 4-5. The Court heard the parties on the pending motion and took the matter under advisement.[2] D. 41, 46.

V.      **Discussion**

   A.      **Monell Claim under 42 U.S.C. § 1983 (Count I)**

Pope alleges that the City violated his Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 based on various BPD's policies and practices concerning the preparation and presentation of witness testimony, fabricating, withholding, and destroying evidence, inducing false testimony, suppressing statements that were legally required to be provided to the defense, deliberately failing to investigate the actual perpetrators, assisting potential exculpatory witnesses in being unable to testify, engaging in improperly suggestive identification procedures, and failure to properly supervise, train and discipline its employees for withholding material evidence or fabricating false evidence. D. 1 ¶¶ 1-2, 78-80, 82-83, 85.

Although "[a] municipality cannot be held liable under § 1983 on a *respondeat superior* theory," § 1983 does impose "liability on a government that, under color of some official policy, causes an employee to violate another's constitutional rights." Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 691–92 (1978) (internal quotation marks and citation omitted). A

---

[2] Following the hearing, Pope moved for entry of default judgment against the City on the grounds that it is the "real party in interest" concerning Pope's claims against Defendants O'Malley and Curran, both of whom are deceased and have not filed a responsive pleading, D. 42, which the City opposed, D. 44. The Court denied that motion, D. 45.

municipality's failure to train or supervise its officers may amount to a "policy or custom" for purposes of § 1983 liability only where the inadequate training shows "deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388-89 (1989). "[D]eliberate indifference is a stringent standard of fault," such that "[a] showing of simple or even heightened negligence will not suffice." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 407, 411 (1997) (internal quotation marks and citation omitted). A city may be deemed deliberately indifferent when it is "on actual or constructive notice that a particular omission in [its] training program causes [officers] to violate citizens' constitutional rights" and fails to properly respond, either by providing appropriate training or through disciplinary action. Connick v. Thompson, 563 U.S. 51, 61 (2011). "A pattern of similar constitutional violations by untrained [officers] is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." Id. at 62 (internal quotation marks and citation omitted). "A municipality's culpability for a deprivation of rights is [also] at its most tenuous where a claim turns on a failure to train." Id. at 61. Further, to place the municipality on actual or constructive notice of the lack of training or the inadequacy of the training, the pattern of prior constitutional violations must be similar to those at issue in this case. See id. at 62. "[A] plaintiff must also show that municipal policy was the 'moving force' behind the claimed deprivation of constitutional rights." Qualls v. Roache, No. 23-cv-10435-GAO, 2024 WL 1333610, at *2 (D. Mass. Mar. 28, 2024) (citing Santiago v. Fenton, 891 F.2d 373, 382 (1st Cir. 1989)).

      Pope alleges that the City is liable because for many years, the City and certain police officers engaged in various patterns and practices of "fabricating, withholding, and destroying evidence, inducing false testimony, suppressing statements that were legally required to be provided to the defense, deliberately failing to investigate the actual perpetrators, assisting

potential exculpatory witnesses in being unable to testify, and engaging in improperly suggestive identification procedures." D. 1 ¶ 1.  The complaint alleges that BPD and the City "failed to train, discipline, and supervise officers who conducted investigations into homicides" and the City "was, or should have been, aware of the potential for misconduct and actual misconduct of its officers, but failed to act." Id. ¶¶ 12-13.  The complaint further alleges that throughout "the 1970s and 1980s, officers of the [City] regularly withheld and fabricated evidence, leading to botched investigations and wrongful convictions." Id. ¶ 70.  In support of a pattern and practice, the complaint alleges that there were at least five other cases involving O'Malley both before and after Pope's investigation and conviction in which he demonstrated misconduct by "facilitat[ing] flawed identifications," id. ¶ 60, pressured a witness to provide false testimony, id. ¶ 61, and several years later was the lead detective in a "botched investigation" that included using false information in relation to search warrant affidavits, id. ¶¶ 63, 65-67.  The complaint also points to two reports from the 1990s as support that O'Malley engaged in practices of threatening witnesses to provide false testimony, including the St. Clair Committee Report which described that the BPD in general had inadequate training, supervision and discipline. Id. ¶¶ 64, 71-72.  Pope further alleges that BPD's "widespread practices, which were so well settled as to constitute the *de facto* policy of the [City], were allowed to exist because the municipal policymakers with authority over the same exhibited, at minimum, deliberate indifference to the problem" and these widespread practices were the "moving force" behind the misconduct that constituted the constitutional violations in Pope's case. Id. ¶¶ 83-84.

The City challenges that Pope's allegations do not support a pattern and practice of deliberate indifference because the alleged allegations from the cited cases fail to show a history of constitutional violations by the City and even the alleged incidents could not have put the City

on notice of a failure to train because the incidents alleged occurred after 1986, the year in which Pope was convicted.³  See D. 22 at 9-13.  Most instructive here is Haley v. City of Bos., 657 F.3d 39, 52 (1st Cir. 2011) in which the First Circuit affirmed that more generalized allegations were sufficient at the pleading stage.  In Haley, the First Circuit held that plaintiff had adequately alleged a Monell violation that the BPD had a standing policy or practice of withholding exculpatory information and had failed to train its officers based on BPD withholding certain exculpatory witness statements from the prosecution and that BPD "regularly kept helpful evidence from criminal defendants" to secure successful prosecutions.  Id. at 53.  In reversing the dismissal, the First Circuit relied upon "the volume of cases involving nondisclosure of exculpatory information" and further held that the motion to dismiss stage was "neither the time nor the place to resolve the factual disputes between the parties."  Id. at 53; see Kendall v. City of Boston, No. 21-cv-10711-ADB, 2022 WL 598165, at *5 (D. Mass. Feb. 28, 2022) (concluding that even though the complaint is "bare bones" the allegations were sufficient to survive a motion to dismiss because at the motion to dismiss stage "the First Circuit has held that similarly broad allegations were found to be sufficient in Haley"); Echavarria v. Roach, No. 16-cv-11118-ADB, 2017 WL 3928270, at *5 (D. Mass. Sept. 7, 2017) (holding plaintiff's generalized allegations were sufficient to state a claim based on Haley because plaintiff had claimed that "the city had notice of widespread practices by its officers and agents under which individuals suspected of criminal activity were deprived of

---

³ Although the City argues that the incidents alleged occurred after Pope's conviction in 1986, and specifically between 1990 to 2022, D. 22 at 13, the Court notes that, as alleged, the investigations and convictions of at least some of these incidents occurred in the 1970s.  See D. 1 ¶¶ 60-62.

8

exculpatory evidence" and these policies, practices and customs were the "moving force" behind the violation of the plaintiff's constitutional rights) (internal citations omitted).[4]

In light of Haley and its progeny, the Court agrees that Pope's allegations are sufficient at the pleading stage to allege a Monell claim that the City was on notice of constitutional violations. Although "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program," Canton, 489 U.S. at 390–91, here, it has been alleged that O'Malley engaged in falsification of evidence, coercion of witnesses and untruthful testimony both pre-dating and post-dating Pope's investigation, arrest and conviction which are a plausible pattern and practice widespread enough to plausibly put the City on notice of same. See Humphrey v. Comoletti, No. 15-cv-14170-ADB, 2017 WL 1224539, at *10 (D. Mass. Mar. 31, 2017) (reasoning that allegations of two incidents, within a five-year period, that each involved the possible use of excessive force by the Fall River Police, and involved the same officer, were facts that "very thinly but plausibly suggest the City's deliberate indifference to the fact that their policies or customs may lead to constitutional violations").

---

[4] The City relies upon Qualls v. Roache, 2024 WL 1333610, at *1-2, D. 22 at 12, in which another session of this Court concluded that plaintiff's allegations, in which he cited to a special commission report in 1992 that reviewed complaints filed against the BPD and seven criminal convictions that were later overturned based on findings of misconduct by the Boston police between 1989 and 1994, were insufficient to allege a pattern of constitutional violations of withholding exculpatory evidence and to show that the City of Boston was deliberately indifferent to constitutional violations and failed to train and discipline officers. See Qualls, 2024 WL 1333610, at *1-2. The court reasoned that dismissal was appropriate because the allegations in the cases identified by the plaintiff were not akin to the plaintiff's allegations and the complaint did not allege "particular acts of willful misbehavior by officers that were effectively countenanced by the City of Boston." Id. at *2. The court in Qualls cited Haley, but did not address or distinguish the allegations that were deemed sufficient to survive a motion to dismiss in Haley. See id. Moreover, unlike in Qualls, Pope has alleged a specific pattern of O'Malley failing to be truthful and execute his duties lawfully both before and after Pope's investigation and conviction. See D. 1 ¶¶ 60-67. For all these reasons, Qualls does not warrant a different conclusion here.

Although "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train," Connick, 563 U.S. at 62, Pope has also alleged that throughout "the 1970s and 1980s, officers of the [City] regularly withheld and fabricated evidence, leading to botched investigations and wrongful convictions." D. 1 ¶ 70. Pope further points to evidence from Haley v. City of Bos., No. 09-cv-10197-RGS, 2013 WL 4936840, at *5 (D. Mass. Sept. 12, 2013), D. 1 ¶ 70, in which testimony from the former BPD Commissioner indicated that "there was no policy or practice in the BPD [in 1971 and 1972] requiring the disclosure of exculpatory and/or impeachment evidence to state prosecutors or to defendants." Haley, 2013 WL 4936840, at *5-6 (denying summary judgement as there was a dispute of fact concerning whether BPD had a policy and practice for withholding exculpatory information and deficient training). Multiple instances of misconduct, especially when perpetrated by the same department or even individual officer, may demonstrate a failure to train or discipline. See Humphrey, 2017 WL 1224539, at *10. Here, Pope's allegations, in combination with the various instances of misconduct by O'Malley and the fact that the City had been sued previously for similar constitutional violations based on the same time period, at a minimum, suggest that the City had notice of constitutional violations committed by its officers, exacerbated by inadequate training and discipline, and was deliberately indifferent to the rights of its residents. See Perrot v. Kelly, No. 18-cv-10147-DPW, 2023 WL 2939277, at *21 (D. Mass. Feb. 15, 2023), report and recommendation adopted, No. 18-cv-10147-DPW, 2023 WL 2607763, at *1 (D. Mass. Mar. 23, 2023) (holding that plaintiff had plausibly alleged that the City was on notice at the time of plaintiff's injury that officers consistently violated the constitutional rights of suspects, because the City "had been sued at least twice in federal court for claims that are almost identical to the claims levied here – wrongful arrest and questioning of a minor,

10

unlawful or excessive use of force, and malicious prosecution"); Roberts v. Town of Bridgewater, No. 15-cv-10266-DJC, 2015 WL 4550783, at *5 (D. Mass. July 28, 2015) (concluding that plaintiff had plausibly stated a Monell claim because the plaintiff had alleged that "the Town of Bridgewater has had a custom and policy for the past 10+ years of not providing exculpatory evidence in cases to protect its officers in clear and serious violation of [people's] constitutional rights") (internal quotation marks and citation omitted).  Accepting the allegations as true and drawing reasonable inferences in favor of Pope, the Court holds that Pope has plausibly stated a Monell claim under § 1983.

### B. Dismissal of Count VII for Lack of Presentment is Not Warranted

The City argues that Count VII should be dismissed because Pope failed to comply with the presentment requirements required by the Massachusetts Torts Claim Act ("MTCA") pursuant to Mass. Gen. L. c. 258 § 4.  Pursuant to the MTCA, a tort claim may not be brought against a public employer unless the plaintiff "first presented his claim in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose, and such claim shall have been finally denied by such executive officer in writing."  Mass. Gen. L. c. 258, § 4 (noting that "in the case of a city or town, presentment of a claim pursuant to this section shall be deemed sufficient if presented to any of the following:  mayor, city manager, town manager, corporation counsel, city solicitor, town counsel, city clerk, town clerk, chairman of the board of selectmen, or executive secretary of the board of selectmen").  "[The MTCA's] strict presentment requirement is a statutory prerequisite for recovery under the Act."  Kendall, 2022 WL 598165, at *7 (internal quotation marks and citation omitted).  The strict compliance "is concerned more with whether presentment has been made to the proper executive officer (*proper party noticed*) in a timely fashion (*timeliness*) than with the content of the presentment (*adequacy of content*)."  Martin v. Commonwealth, 53 Mass. App. Ct. 526, 529 (2002) (emphasis in original).

"The purpose of the presentment requirement is to ensure[ ] that the responsible public official receives notice of the claim so that that official can investigate to determine whether or not a claim is valid, preclude payment of inflated or nonmeritorious claims, settle valid claims expeditiously, and take steps to ensure that similar claims will not be brought in the future." Kendall, 2022 WL 598165, at *7 (internal quotation marks and citations omitted); see Weaver v. Commonwealth, 387 Mass. 43, 47-48 (1982) (reasoning that the MTCA requires presentment to the appropriate executive officer with the authority to settle a claim before suit is instituted because the "highest officer of an executive department is not only in a position to undertake the investigation" but also "to institute promptly any corrective measures designed to reduce the number of valid claims in the future").

Although Pope did not make presentment directly to the City's Corporation Counsel, Adam Cederbaum ("Cederbaum"), it is not disputed that he mailed a demand letter to the First Assistant Corporation Counsel and Chief of Litigation, Susan Weise, on May 3, 2023, D. 22 at 14; D. 26 at 17, and that Weise works within the Corporation Counsel department and serves as Cederbaum's "second-in-command." D. 26 at 17. The Court notes that at least one Massachusetts court has held that presentment is satisfied if the letter was mailed to the proper office of the requisite executive officer, as was done so here. See Amaral v. City of Fall River, No. 22-P-49, 2022 WL 16752885, at *1-2  (Mass. App. Ct. Nov. 8, 2022) (unpublished) (reasoning that a presentment letter sent to the "City of Fall River – Law Department" with the salutation "Dear Sir/Ma'am," was adequate to meet the presentment requirement in the statute" because the letter was addressed to the office of the relevant official and plaintiff received a response in which followed lengthy settlement negotiations) (internal citations omitted).  Even assuming *arguendo* that the presentment "must go to the proper individual," Corporate Counsel Cederbaum, Bellanti v. Bos.

Pub. Health Comm'n, 70 Mass. App. Ct. 401, 406 (2007) (reasoning that presentment was defective because the letter addressed to "The Public Health Commission" was not received by the commission's executive officer); Lopez v. Lynn Hous. Auth., 440 Mass. 1029, 1030 (2003) (reasoning that strict presentment was not satisfied when the letter was addressed to the "Lynn Housing Authority" because it was not directed to the appropriate executive officer), and the communication to his personally addressed, second-in-command Weise in the same office was not sufficient for these purposes, then the "actual notice" exception to presentment applies. Bellanti, 70 Mass. App. Ct. at 406-07 (recognizing the "lulling" exception and "actual notice" exception to presentment). Under the "actual notice" exception, presentment is satisfied if the executive officer of a public employer had "actual notice" of a plaintiff's claim. See Fed. Ins. Co. v. Bos. Water & Sewer Comm'n, 583 F. Supp. 2d 225, 232 (D. Mass. 2008). Pope points to the extensive interactions with the City and Weise indicate that Cederbaum had actual notice of the claims. D. 26 at 19. "Where the proper executive officer was able to investigate the claim, and then use his authority to determine whether an offer of settlement should be made, the ultimate purpose of the presentment requirement of G. L. c. 258, § 4, was satisfied, and thus, the actual notice exception was also satisfied." Doe v. Cambridge Pub. Sch., 101 Mass. App. Ct. 482, 490 (2022). Here, the circumstances show that Corporation Counsel had actual notice of the claims as required under the exception where his office engaged in discussions with Pope and his counsel for months, exchanged discovery and was able to investigate Pope's claims, which is the purpose of the requirement. D. 26 at 18-19; see Lopez, 440 Mass. at 1030 (reasoning that given the unique circumstances of the case where there was acknowledgement that the claim had been investigated by the executive officer, the purpose of the presentment requirement had been fulfilled despite the

fact that Lopez made presentment to the "Lynn Housing Authority," and not its executive officer). Accordingly, the Court denies the City's motion to dismiss Count VII on this basis.[5]

## VI. Conclusion

For the foregoing reasons, the Court DENIES the City's motion to dismiss, D. 21, as to Counts I and VII.

**So Ordered.**

/s Denise J. Casper
United States District Judge

---

[5] Given the Court's holding above, the Court need not reach Pope's alternative argument that the lulling exception to presentment also applies here. D. 26 at 18-19.